UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | No. |
| | : | |
| v. | : | |
| | : | |
| **ROCKWATER NORTHEAST LLC**, | : | (electronically filed) |
| Defendant | : | |

## INFORMATION

THE UNITED STATES ATTORNEY CHARGES:

### COUNTS 1 THROUGH 31
Violations of the Clean Air Act
42 U.S.C. § 7413(c)(2)(C)

## I.   Introduction

At times material to the Information:

### Relevant Individuals and Entities

1.    Defendant ROCKWATER NORTHEAST LLC

(ROCKWATER) was a company headquartered in Canonsburg,

Pennsylvania, with facilities in the Middle District of Pennsylvania and

the Western District of Pennsylvania.  ROCKWATER provided services

to the hydraulic fracturing industry in Pennsylvania, including the

provision and transportation of water and wastewater.

2.    The Environmental Protection Agency (EPA) was an agency

of the United States responsible for enforcing and administering the Clean Air Act.

3.     The Federal Motor Carrier Safety Administration (FMCSA) was an agency of the United States Department of Transportation (USDOT) responsible for regulating the safe and efficient travel of commercial motor vehicles.  Companies that maintained commercial motor vehicles to transport passengers or haul cargo in interstate commerce were required to register with the FMCSA and obtain a USDOT number that served as a unique identifier.

4.     ROCKWATER, when it was formerly known as Red Oak Water Transfer Northeast LLC, registered with FMCSA as an interstate carrier of oil field equipment and was assigned USDOT number 1893956.

## Emissions Systems and Regulations

5.     The purpose of the Clean Air Act was to protect and enhance the quality of the nation's air resources, thus promoting public health and welfare by, among other things, reducing the emission of pollutants, such as nitrogen oxides, particulate matter, hydrocarbons,

2

and carbon monoxide, from motor vehicles.

6.    The Clean Air Act and its implementing regulations established standards limiting the emission of pollutants from various classes of motor vehicle engines, including heavy-duty diesel engines.

7.    To meet emissions standards, manufacturers of vehicles bearing heavy-duty diesel engines installed a variety of hardware emissions control devices, including exhaust gas recirculation systems, selective catalytic reduction systems, and diesel particulate filters. After verifying that the emissions control devices conformed to emissions standards, the EPA issued Certificates of Conformity to vehicle manufacturers specific to each annual vehicle class.

8.    To enforce compliance with emissions standards, the EPA, pursuant to its regulatory authority, created regulations requiring manufacturers to install on-board diagnostic systems (OBDs) on vehicles.  OBDs monitored emissions-related sensors and the hardware emissions control devices of heavy-duty diesel engine systems and components.

9.    OBDs alerted vehicle operators, through a malfunction

3

indicator light, when a component of the emissions-monitoring system deteriorated or malfunctioned. When the malfunction was left unaddressed and the vehicle's emissions exceeded certain emissions level thresholds, the OBD forced the vehicle's engine to shut down, or limited the vehicle to a maximum speed of as low as five miles per hour; an effect commonly referred to as "limp mode" or "power reduced mode."

10.    Repairs for malfunctioning or deteriorating emissions systems on diesel vehicles in "limp mode" ordinarily cost between approximately $1,000 and $10,000. Repairs ordinarily took several days or weeks to complete, during which time the vehicles were inoperable.

11.    The Clean Air Act prohibited any person from tampering with or rendering inaccurate vehicle emissions monitoring devices and methods, including OBDs and hardware emissions control devices.

12.    The FMCSA, pursuant to its regulatory authority, required commercial motor vehicles to pass annual inspections. The FMCSA delegated the administration of those inspections to certain states, including Pennsylvania, whose inspection standards met minimum

federal standards.

13.   In Pennsylvania, the Pennsylvania Department of
Transportation (PennDOT) oversaw motor vehicle safety inspection
programs.  PennDOT, pursuant to its regulatory authority, required
commercial diesel-powered motor vehicles to pass a safety inspection,
and prohibited any device or modification that bypassed exhaust system
emissions components.  Pennsylvania prohibited the intentional
modification or alteration of a factory-installed smoke control system on
diesel-powered vehicles and their fuel systems that limited the system's
ability to control smoke.  Pennsylvania also prohibited removal of the
smoke control system, except for repair or installation of a proper
replacement.  Pennsylvania further prohibited disabling, altering, and
changing an emission control system of a vehicle, requiring all original
emissions control components to be present and functioning.

14.   PennDOT required annual vehicle safety inspections to
ensure that vehicles were maintained for safe operation. The safety
inspection procedure included inspection and testing of a variety of
vehicle components, including hardware emissions systems.  Certified

5

vehicle safety inspectors performed vehicle safety inspections at official PennDOT inspection stations. Certified vehicle safety inspectors affixed a certificate to vehicles that passed inspection, to demonstrate compliance with PennDOT inspection standards, and reported the inspection results to PennDOT.

## Emissions System Tampering Devices

15.    Hardware emissions control devices and OBDs could be disabled on commercial vehicles bearing heavy-duty diesel engines, using a variety of aftermarket devices. Disabling the emissions control systems defeated their ability to limit pollutant gases and particulate matter into the atmosphere.

16.    One method used to disable hardware emissions control devices was to remove the portion of the vehicle's exhaust system that contain the emission control devices and replace it with a section of exhaust tubing or a "straight pipe" that did not limit emissions.

17.    Another, generally less expensive method used to disable hardware emissions control devices was to remove certain components, such as the selective catalytic reduction system and diesel particulate

6

filter, by hollowing out their casing in the vehicle's exhaust pipe, and then re-welding the entry point to create the false appearance that the hardware emissions control devices remained installed.

18.    OBDs detected disabling modifications to the hardware emissions control devices on vehicles.  Thus, any modifications to the hardware emissions control devices necessarily included a contemporaneous disabling of the OBD, to avoid the vehicle going into "limp mode."

19.    The devices used to disable OBDs commonly were referred to as "defeat devices," "DPF defeats," "delete devices," "tuners," "performance tuners," "conversion kits," and "programmers," (collectively referred to as "defeat devices").  Several manufacturers offered a variety of defeat devices.

20.    One type of defeat device was an apparatus that plugged into a vehicle's data link connector to "tune" the OBD.  Those defeat devices, when plugged in, allowed the vehicle operator to activate at will the software modifications that manipulated the OBD.

21.    Another type of defeat device was a software program that

7

reprogrammed, or "flashed," the vehicle's diesel engine computer

module, through use of a computer or electronic device that modified

the OBD after being connected to the vehicle on a single occasion.

Those defeat devices permanently adjusted the diesel engine timing and

other parameters to bypass the OBD.

22.    In addition to disabling the OBD, defeat devices also

improved heavy-duty diesel engines' horsepower, torque, and fuel

efficiency.

## Rockwater Tampering with Emissions Systems

23.    At times material to the Information, ROCKWATER owned,

possessed, and maintained at its Pennsylvania facilities commercial

vehicles bearing heavy-duty diesel engines, for business purposes and

use by employees, contractors, and agents.

24.    ROCKWATER managers and employees replaced and

caused to be replaced hardware emissions control devices on

ROCKWATER commercial motor vehicles containing heavy-duty diesel

engines, with exhaust tubing or "straight pipes."

25.    ROCKWATER managers and employees removed and

8

caused to be removed hardware emissions control devices on ROCKWATER commercial motor vehicles containing heavy-duty diesel engines, by extracting the emissions control devices from their compartments, and then re-welding the entry point to create the false appearance that the hardware emissions control devices remained installed.

26.  ROCKWATER purchased defeat devices from third-party vendors, and ROCKWATER managers and employees used and caused to be used those defeat devices to disable the OBDs on ROCKWATER vehicles whose hardware emissions control devices had been removed.

27.  ROCKWATER managers and employees arranged and caused to be arranged for ROCKWATER vehicles with disabled OBDs and hardware emissions control devices, to undergo annual PennDOT vehicle safety inspections by third parties.  ROCKWATER managers and employees arranged and caused to be arranged for those third parties to issue certificates stating that Rockwater vehicles with disabled OBDs and hardware emissions control devices met PennDOT inspection standards, when in fact they did not.

28.    Between on or about August 1, 2013 and June 30, 2014, ROCKWATER managers and employees removed hardware emissions control devices from 31 ROCKWATER commercial motor vehicles containing heavy-duty diesel engines, and used defeat devices to disable the OBDs for those 31 vehicles.

29.    As a result of the emissions systems tampering, ROCKWATER obtained economic benefits, including fuel savings from improved fuel economy on modified vehicles; reduced expenditures on diesel exhaust fluids required to operate emissions systems components; reduced repair and maintenance costs for malfunctioning or deteriorating emissions systems; and the avoidance of lost business and revenue from vehicles rendered out of service while undergoing emissions systems repair and maintenance.

30.    As a result of the emissions systems tampering, modified ROCKWATER vehicles emitted tons of excess emissions, including nitrogen oxides and particulate matter, into the atmosphere.

## II.   Statutory Allegations

31.   From on or about August 1, 2013 through on or about June 30, 2014, in the Middle District of Pennsylvania, and elsewhere, the defendant,

ROCKWATER NORTHEAST LLC,

did knowingly falsify, tamper with, render inaccurate, and fail to install a monitoring device and method required to be maintained under the Clean Air Act, that is, emissions systems components on the ROCKWATER NORTHEAST LLC commercial motor vehicles containing heavy-duty diesel engines listed below, with each vehicle being a separate count:

11

| Count | Rockwater Unit Number | Make & Model | Year | VIN Number |
|---|---|---|---|---|
| 1 | 185 | Chevy 3500 | 2011 | 1GC4KZC80BF147310 |
| 2 | 189 | Chevy 3500 | 2011 | 1GB4K0CL6BF162656 |
| 3 | 225 | GMC 3500 | 2011 | 1GT422C8XBF177874 |
| 4 | 251 | Chevy 2500 | 2011 | 1GT422C89BF204112 |
| 5 | P-278 | Chevy 3500 | 2011 | 1GC4KZC86BF227050 |
| 6 | 186 | Chevy 2500 | 2011 | 1GC4KZC88BF150312 |
| 7 | 223 | GMC 3500 | 2011 | 1GT422C8XBF202840 |
| 8 | P-281 | GMC 2500 | 2011 | 1GT422C89BF231262 |
| 9 | 173 | Chevy 3500 | 2011 | 1GC4KZC80BF147615 |
| 10 | 216 | GMC 3500 | 2011 | 1GT422C8XBF177941 |
| 11 | 141 | Chevy 3500 | 2011 | 1GC4KZC82BF117919 |
| 12 | 153 | Chevy 3500 | 2011 | 1GB4KZCL9BF131857 |
| 13 | 159 | GMC 3500 | 2011 | 1GD422CL9BF148401 |
| 14 | 161 | GMC 3500 | 2011 | 1GD422CL0BF150327 |
| 15 | 164 | GMC 3500 | 2011 | 1GD422CL3BF149592 |
| 16 | 175 | Chevy 3500 | 2011 | 1GC4KZC84BF150257 |
| 17 | 187 | Chevy 3500 | 2011 | 1GB4KZCL8BF149217 |
| 18 | 199 | GMC 3500 | 2011 | 1GT422C82BF178548 |
| 19 | 202 | GMC 3500 | 2011 | 1GT422C86BF178326 |
| 20 | 217 | GMC 3500 | 2011 | 1GT422C85BF178074 |
| 21 | 248 | GMC 3500 | 2011 | 1GT422C89BF209570 |
| 22 | 201 | GMC 3500 | 2011 | 1GT422C84BF179281 |
| 23 | 325 | Chevy 3500 | 2011 | 1GC1KVC8XCF189030 |
| 24 | 191 | Chevy 3500 | 2011 | 1GB4KZCL7BF149760 |
| 25 | 285 | Chevy 2500 | 2011 | 1GC1KXC84BF256974 |
| 26 | 170 | Chevy 3500 | 2011 | 1GC4KZC8XBF111611 |
| 27 | 181 | Chevy 3500 | 2011 | 1GC4KZC85BF148324 |
| 28 | 192 | Chevy 3500 | 2011 | 1GB4KZCL7BF155963 |
| 29 | 284 | Chevy 3500 | 2011 | 1GC4KZC8XCF114848 |
| 30 | 250 | GMC 3500 | 2011 | 1GT422C83BF204106 |
| 31 | 178 | Chevy 3500 | 2011 | 1GB4KZCL3BF149271 |

In violation of Title 42, United States Code, Section 7413(c)(2)(C).

> DAVID J. FREED
> United States Attorney

Date: 9/21/20          By:

> PHILLIP J. CARABALLO
> SEAN A. CAMONI
> Assistant United States Attorneys
> PATRICIA C. MILLER
> Special Assistant United States
> Attorney

13